IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 15 Case |
| LZLABS GMBH | § § § | Case No. 25-60769-mmp |

**IBM'S OBJECTION TO EMERGENCY MOTION OF THE
DEBTOR, AS FOREIGN REPRESENTATIVE, FOR PROVISIONAL
RELIEF PURSUANT TO BANKRUPTCY CODE SECTION 1519**

International Business Machines Corporation ("IBM") respectfully objects to the Emergency Motion of the Debtor, as Foreign Representative, for Provisional Relief Pursuant to Bankruptcy Code Section 1519 ("Objection").

**PRELIMINARY STATEMENT**

After obtaining a moratorium order from a Swiss court on August 15, 2025, Debtor did not petition for recognition in a U.S. court nor take any other action that suggests it is a party in urgent need of injunctive relief. Instead, it continued to actively litigate the case brought by IBM in the this District, *IBM Corp. v. LzLabs GMBH*, 6:22-CV-00299-DAE (W.D. Tex) ("U.S. IBM Case"). It made sure to finish briefing its renewed motion for summary judgment on a limitations defense on which it hoped to prevail. While waiting for the ruling, it let the expert report deadlines in the case pass without serving any reports (presumably because it has no substantive defenses). Only after realizing that its renewed MSJ would not be ruled on anytime soon, more than two months after the Swiss moratorium order, it filed this Chapter 15 proceeding seeking injunctive relief on days' notice to address a supposedly urgent need.

To be entitled to provisional injunctive relief before recognition of a foreign proceeding takes place, a debtor must show the relief is "urgently needed to protect the assets of the debtor or

the interests of creditors." 11 U.S.C. §1519(a). To obtain relief, it must meet the "standards, procedures, and limitations applicable to an injunction." *Id*. §1519(e). Here, the Debtor cannot establish that any of the factors for injunctive relief weigh in its favor.

Notably, the Debtor's two-plus month delay in seeking such relief, while actively pursuing the U.S. IBM Case, confirms there is no urgent need or imminent, irreparable harm threatened. LzLabs comes nowhere close to meeting the high evidentiary bar under §1519—the same as for a preliminary injunction—to prove that it is entitled to injunctive relief before recognition is granted.

**I.       The debtor's active litigation of the U.S. IBM Case since the Swiss moratorium confirms that there is no imminent, irreparable harm.**

The debtor's gamesmanship in pursuing the U.S. IBM Case and awaiting a ruling on its still-pending MSJ demonstrates there is no "urgent need" for emergency provisional relief.

The Debtor filed a renewed MSJ on limitations grounds in the U.S. IBM Case on August 7, 2025. Ex. 1, U.S. IBM Case Docket Sheet (ECF 431 filed under seal). A week later, it obtained a moratorium order from a Swiss court on August 15, 2025. ECF 1 at 24. But the Debtor did not seek immediate recognition under Chapter 15 or assert any "urgent need," but instead continued to litigate the U.S. IBM Case. IBM filed a response brief on August 22, 2025, and the Debtor filed its reply brief on September 5, 2025. Ex. 1, U.S. IBM Case Docket Sheet (ECF 433, 434, 436, 437 filed under seal). While waiting for the court to rule on its motion, the deadline for affirmative expert reports came and went on September 12, as did the deadline for rebuttal expert reports on October 24. Ex. 2, U.S. IBM Case, ECF 419 (Amended Scheduling Order). Banking on its MSJ, the Debtor served no expert reports but continued to tell IBM that it fully intended to move forward with its defenses and still did not seek recognition of the Swiss moratorium order. Not until October 24, 2025, over two months after the Swiss order was issued, did the Debtor seek recognition or a stay of the IBM U.S. Case. ECF 1.

-2-

The Debtor wrongly suggests that the fact that resources must be expended by the estate amounts to irreparable harm. ECF 3 at 10-11. But neither cited case holds as much. To the contrary, *In re Netia Holdings S.A.*, 278 B.R. 344, 352 (Bankr. S.D.N.Y. 2002), considers irreparable harm related to the seizure of assets, not the expenditure of resources on a lawsuit. And *In re MMG, LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000), stands for the opposite proposition. There, the court held that the threat of litigation is *not* the same as the threat of assets being seized and denied an injunction because the cost of defending claims would not threaten the estate.

The Debtor does not and cannot evidence any urgent need or imminent, irreparable harm that would justify provisional relief before recognition of a foreign proceeding.

## II. The balance of harms weighs against granting an injunction, which would allow LzLabs to continue to harm IBM.

As the Debtor admits, a court only may "grant relief under section 1521 of the Bankruptcy Code if the interests of 'the creditors and other interested entities, including the debtor, are sufficiently protected.'" ECF 3 ¶22 (quoting 11 U.S.C. §1522(a)); *see also* ECF 3 ¶11 (explaining that the requested stay is authorized by §1521). To determine whether interests are "sufficiently protected," "courts have engaged in a balancing of the relative hardships to the parties . . . in light of the circumstances presented." *In re Sanjel (USA) Inc.*, 2016 WL 4427075, at *5 (Bankr. W.D. Tex. July 29, 2016) (cite omitted); *see also In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1060 (5th Cir. 2012) (§1522 "requires that the relief contemplated under §1521 balance the interests of the creditors and debtors").

For example, in *Sanjel*, the court considered whether to modify a stay under §1521 to permit Fair Labor Standards Act actions to proceed where the claims might later be unavailable due to the statute of limitations period. 2016 WL 4427075, at *5. Although the debtor argued that this additional litigation would burden its ability to efficiently conclude its restructuring tasks, the

-3-

court found that the burden did not outweigh the prejudice to the movants and allowed the actions to proceed. *Id.*, at *6-7.

Likewise, an injunction would provide minimal benefit to LzLabs but would greatly prejudice IBM. As explained above, LzLabs has no imminent need for an injunction. It has continued to litigate in the U.S. proceedings for over two months since obtaining the moratorium order from the Swiss court, demonstrating that continued litigation does not cause it irreparable harm and that there is no imminent need for relief.

By contrast, a stay of the U.S. IBM Case will harm IBM and its intellectual property. IBM filed the case on March 21, 2022, accusing the Debtor and Texas Wormhole, LLC of infringing IBM's United States Patents, misappropriating IBM's trade secrets, and false advertisement. *IBM Corp. v. LzLabs GMBH*, 2023 WL 11916821, at *1 (W.D. Tex. 2022). LzLabs had gone to great lengths to hide its infringement, including using a separate entity with no business except to act at the direction of LzLabs to license IBM's mainframe software from a subsidiary of IBM. U.S. IBM Case, ECF 1 ¶2. LzLabs then used this entity to reverse engineer IBM software to gain IBM's trade secret and proprietary information, which it used to develop a competing product. *Id.* Despite a judgment and permanent injunction against it in the U.K., LzLabs continues to deny responsibility for its acts. *See* Ex. 3, *Neon Enterprise Software, LLC v. IBM Corp.*, No. 1:09-cv-00896-DH (W.D. Tex.) ECF 217-5 ("U.K. Final Judgment").

A stay could allow LzLabs to continue to infringe on IBM's property rights in the U.S. Instead, a swift conclusion of the U.S. proceeding is necessary to prevent further improper use by LzLabs of IBM's intellectual property. Further, in light of LzLabs' repeated efforts to conceal its misuse of IBM intellectual property, the damage that occurs or could occur as a result of any delay in the U.S. proceedings may be difficult to identify or quantify.

But there is no question that a stay would harm IBM and is not necessary to avoid harm to LzLabs. IBM would not be protected. The balancing of harms weighs decidedly against a stay.

### III. IBM has a strong likelihood of success on the merits as demonstrated by its UK win and the fact that LzLabs did not rebut its expert reports in the IBM U.S. Case.

LzLabs points to the wrong standard for likelihood of success on the merits in this context. Mot. at 8-9. It focuses on its likelihood of success in the bankruptcy proceedings. Mot. at 8-9. But the relevant standard is not whether LzLabs is likely to obtain recognition of the foreign proceeding or a successful reorganization. *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 183 (Bankr. N.D. Tex. 2012) ("Nor is the question whether Debtors can show a reasonable likelihood of a successful reorganization."). Instead, as one of the cases cited in its motion explains, likelihood of success "refer[s] not to the successful completion of reorganization, but to the non-bankruptcy action itself." *In re Vitro, S.A.B. de C.V.*, 455 B.R. 571, 580-81 (Bankr. N.D. Tex. 2011) (quoting *In re Commonwealth Oil Refining Co.*, 805 F.2d 1175, 1189 (5th Cir.1986).

So, LzLabs must show that it is likely to succeed in the underlying infringement action. *See id.* It has not and cannot make such a showing. In March, IBM won a related lawsuit against LzLabs and LzLabs' U.K. subsidiary, among others. *See* Ex. 3, UK Final Judgment, in the High Court of Justice, Business and Property Courts of England and Wales, Technology and Construction Court (KBD). The High Court of Justice of England and Wales held a 33-day trial of IBM UK's claims against LzLabs, among other defendants. *Id.* After hearing over 20 trial witnesses, the U.K. Court issued a 253-page final judgment in favor of IBM UK. *Id.* The U.K. Court found that LzLabs procured reverse assembly, decompilation, and translation IBM programs. The U.K. Court of Appeal then refused the U.K. defendants' (including LzLabs) request to appeal, noting that the lower court's judgment was "an impressive piece of work" and "the product of an enormous amount of industry and skill on the part of the [trial] judge." Ex. 4, *LzLabs*

*Gmbh v. IBM UK Ltd.*, [2025] EWCA (Civ) 842 (CA). It categorized LzLabs' arguments attacking the judgment as "hopeless" and "unarguable." *Id.* ¶127.

IBM's decisive U.K. win significantly strengthens its likelihood of success in the U.S. IBM Case. The final liability findings in the UK Case map directly onto the elements of IBM's U.S. claims. So, far from being likely to succeed, LzLabs faces a significant uphill battle: it must overcome a 253-page judgment rejecting essentially every one of its substantive defenses in the U.S. IBM Case.

Critically, LzLabs also failed to timely serve any expert reports for an affirmative invalidity case or to rebut any of IBM's experts in the U.S. IBM case. Expert testimony is functionally indispensable to the claims and defenses in the case, all of which relate to computer architecture, instruction handling, condition codes, runtime environments, and emulation mechanisms. LzLabs' failure to disclose experts will be outcome-determinative because it will be unable to create triable issues of fact on its misappropriation of IBM's trade secrets, or noninfringement or invalidity. *See, e.g.*, *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008) (because the technology was "sufficiently complex to fall beyond the grasp of an ordinary layperson," the district court did not err "in requiring [defendant] to present expert testimony to establish invalidity.").

Whether LzLabs can attain recognition of a foreign proceeding has no bearing on the question before the Court. Under the proper analysis, LzLabs fails to show likelihood of success on the merits in the U.S. IBM Case that it is seeking to stay. IBM won a similar decisive victory in the UK Case, and LzLabs is sure to lose the U.S. IBM Case, especially given its failure to serve expert reports. The motion should be denied. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459,

464 (5th Cir. 2003) ("A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements.").

  **IV. Provisional relief should not be granted because LzLabs will not be able to prove this is a foreign "main" proceeding entitled to an automatic stay.**

A "foreign main proceeding" means a foreign proceeding pending in the country where the debtor has the center of its main interests (known as a "COMI"). 11 U.S.C. §1517(b)(1), §1502(4).

Chapter 15 does not define COMI. There is a statutory presumption that it is the debtor's place of registration or incorporation, but that can be rebutted by a variety of factors including "the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *In re Geden Holdings, Ltd.*, No. 25-90138, 2025 WL 2484883, at *4 (Bankr. S.D. Tex. 2025) (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).

Here, many of these factors demonstrate that Switzerland is not the Debtor's COMI. Other than the site of its headquarters, none of the factors favor a Swiss COMI. LzLabs suggests its management remains in Switzerland, but that is a stretch: in the U.K. trial, LzLabs' CEO testified that he traveled frequently between Austin and Zurich. U.K. Tr. Day 17, Ex. 5, 6:23-7:6. There is little to no evidence that LzLabs' executives still actively direct the company. Instead, as IBM UK showed, key decisions are often made by John Moores, a Texas resident and party to ongoing litigation in the Western District of Texas. Ex. 3, U.K. Final Judgment ¶ 8 ("John Jay Moores, is a software entrepreneur who financed the development of the SDM and is the main beneficial owner of LzLabs, Winsopia and LzLabs UK."); ¶ 919 ("The starting point is to recognise the power and control that Mr Moores exerted over the LzLabs Group, including Winsopia. He did

not have a formal role or title within the LzLabs Group but, as the ultimate owner, he took an acute interest in what was happening with the SDM project, exerted pressure on the management, and obtained regular reports on development progress. This was understandable; he had invested substantial sums of money in LzLabs and wanted to see the results of such funding. . . . Although Mr Moores was not a member of the LzLabs Board of Directors, or an officer of the company, he was appointed as a "board observer" of LzLabs. In that capacity, he attended almost all of LzLabs management board meetings, in which he played an active role and received reports on progress. Mr Cresswell, who was brought in to LzLabs and Winsopia by Mr Moores in 2015 to get a minimum viable product completed and delivered to market, reported directly to Mr Moores. He considered that he was ultimately accountable to Mr Moores and stated that, although he would not necessarily follow all directions from Mr Moores, probably he would not have done anything to which Mr Moores strenuously objected.").

The location of assets also weighs against a Swiss COMI. LzLabs admits that it has valuable intellectual property assets in the U.S. ECF 2 at ¶31. It claims an office in Switzerland, but not ownership of that location. *Id.* ¶ 30.

LzLabs shrugs off the fact that IBM UK is its largest creditor, but that factor weighs heavily in favor of a non-main proceeding. IBM UK is the subsidiary of IBM Corp., based in the U.S. And of course, IBM is actively engaged in related litigation against LzLabs and its principal funder, John Moores, in this District. So, the location of LzLabs' creditors and the impact of any foreign recognition will first and foremost impact the United States.

Finally, Swiss law will not apply most to disputes. The legal proceedings between LzLabs and IBM have been governed by British and American law. Since 2022, IBM has litigated against LzLabs under U.S. trade secret and patent law and is now actively engaged in a contempt

proceeding in U.S. federal court against its principal funder, John Moores. U.S. federal law will govern both proceedings, and there have been no other disputes under Swiss law.

In sum, LzLabs' nominal headquarters is in Zurich, but all other factors favor a non-main proceeding. LzLabs is funded and largely controlled by its U.S.-based founder, has valuable domestic assets, and is engaged in active disputes under U.S. law. LzLabs will not be able to show this is a foreign "main" proceeding.

This is important because the automatic stay in §362 only applies to a foreign main proceeding. 11 U.S.C. §1520(a)(1). By contrast, any stay for a foreign non-main proceeding is discretionary, 11 U.S.C. § 1521(a)(3), and, in this case, should be denied. *Cf. Andrus v. Digital Fairway Corp.*, 2009 WL 1849981, at *2-3 (N.D. Tex. June 26, 2009) (declining to stay action where there was "nothing close to genuine necessity" even though party indicated intention to file for bankruptcy in Canada). A discretionary stay is inappropriate here because, as explained in Section II, a stay would harm IBM and is not necessary to avoid harm to LzLabs.

## CONCLUSION

The fact that LzLabs continued to litigate the U.S. IBM Case for months after the Swiss moratorium demonstrates that LzLabs does not need a stay to avoid imminent, irreparable harm. Further, it cannot show that it meets *any*, much less *all*, of the requirements for injunctive relief. The Court should deny the motion.

Date: October 28, 2025                             Respectfully submitted,

                                                                                       */s/ Jamie A. Aycock*
                                                                                       Jamie A. Aycock
                                                                                       State Bar No. 24050241
                                                                                       Federal ID. No. 1233210
                                                                                       jamieaycock@yettercoleman.com
                                                                                       YETTER COLEMAN LLP
                                                                                       811 Main Street, Suite 4100
                                                                                       Houston, Texas 77002
                                                                                       (713) 632-8000

                                                                                       ATTORNEYS FOR INTERNATIONAL
                                                                                       BUSINESS MACHINES CORPORATION

## CERTIFICATE OF SERVICE

    I certify that on October 28, 2025, the foregoing was served on all counsel of record via CM/ECF.

                                                                                */s/ Jamie A. Aycock*
                                                                                 Jamie A. Aycock